**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

MICHAEL MCCONAUGHEY,

Plaintiff,

-against-

THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY,

Defendant.

-------------------------------------------------------------X

No. 21 Civ. 6137

**COMPLAINT**

Plaintiff Demands Trial By Jury

Plaintiff MICHAEL MCCONAUGHEY, by and through his attorneys, the DEREK SMITH LAW GROUP, PLLC, as and for his Complaint in this action, alleges as follows:

## NATURE OF THE CLAIMS

1. Plaintiff brings this claim to remedy gender identity-based discrimination and retaliation by his employer, The Port Authority of New York and New Jersey (the "Port Authority"), which violated Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII").

2. The Supreme Court has held that an employer violates Title VII, which makes it unlawful to discriminate "because of" an individual's sex, by discriminating against an employee for being transgender. *See generally Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731 (2020). But that is what the Port Authority repeatedly did to Plaintiff in this case.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as it involves federal questions arising under the above-mentioned federal statute.

4. This Court has personal jurisdiction over the Port Authority, as it is headquartered in, has offices in, and does substantial business in, New York.

5. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

6. On about March 21, 2020 – within 180 days of being subjected to the hostile work environment and retaliation alleged herein – Plaintiff submitted a Charge of Discrimination to the U.S. Equal Employment Opportunity Commission.

7. On May 25, 2021 – less than 90 days prior to today's date – the Plaintiff received a "Right to Sue Letter" from the U.S. Department of Justice's Civil Rights Division.

8. As such, Plaintiff satisfied all administrative prerequisites and is timely filing this case.

## PARTIES

9. Plaintiff is an individual residing in New York, New York and was at all times material employed by the Port Authority as a police officer.

10. Plaintiff was diagnosed with gender dysphoria (sometimes pejoratively labeled as "gender identity disorder") in 2018. Plaintiff has since transitioned medically and surgically from a woman to a man.

11. As this Court has noted, the Port Authority is an interstate agency created by New York and New Jersey to develop terminal, transportation, and other commerce facilities in the New York City port district; it operates the interstate vehicular tunnels and bridges within that district, as well as the Port Authority Bus Terminal, PATH, AirTrain, and the Trans-Hudson Ferry Service. *See Scalercio-Isenberg v. Port Auth. of N.Y. & N.J.*, 487 F. Supp. 3d 190, 194 (S.D.N.Y. 2020).

## FACTUAL ALLEGATIONS

12. The Port Authority hired Plaintiff as a police officer on about August 16, 2013. At the time Plaintiff was publicly identified as a woman and no one at the Port Authority had knowledge or awareness that Plaintiff had gender dysphoria and would transition to a man.

13. Plaintiff's work was consistently exemplary, his annual reviews were always above-average or exceptional, and he never had any disciplinary infractions or other performance issues.

14. During the summer of 2018, Plaintiff felt unable to continue living in a woman's body and called Mount Sinai Hospital Center for Transgender Medicine and Surgery to start the transition process. He began the medical and psychotherapy process within weeks.

15. On about July 21, 2018, Plaintiff was dispatched to respond to a report of a man using a woman's restroom. Upon arrival, the individual informed Plaintiff that they were transgender and entitled to use the restroom. Plaintiff concurred, but two of his superiors, Sergeant Pedro Morales and Sergeant Joseph Brenneck disagreed and ejected the person from the restroom.

16. Plaintiff subsequently requested a meeting with their superior, and met with Lieutenant Thomas Michaels to discuss the incident. During the meeting, Plaintiff revealed that he was in the process of transitioning and would need to switch locker rooms soon.

17. Within days, the Port Authority's Human Resources and Business Strategy Solutions (HR) Representative Stephanie Desire contacted Plaintiff to discuss his transition. Plaintiff informed her that he needed to switch to the men's locker room and restroom (which required managerial approval for reprogramming of his ID access card), as well as new locker assignments; Plaintiff further noted that the Port Authority's policies on restroom and locker room usage should be updated so that any employee who wanted to transition would have a process for

switching restrooms and locker rooms. Desire questioned whether that was necessary; Plaintiff insisted was.

18. Several days later, Plaintiff submitted a written request (known informally as a "Handwritten Memorandum") to switch his locker to a male locker room. Thirty days later, with no response, Plaintiff submitted a second Handwritten Memorandum, on which he reiterated his request to switch locker rooms – and further suggested that the Port Authority's failure to assign him the locker room of his choice constituted unlawful discrimination.

19. Several days after that, HR Representative Desire contacted Plaintiff and asked him whether he could hold off on switching locker rooms while the Port Authority's insurers and legal department approved a new policy. Plaintiff reluctantly agreed.

20. It then took about half a year – until January 2019 – for the Port Authority to actually issue a policy allowing transgender employees to use their preferred names and pronouns in written documents and electronic communications, and to use the restroom and locker room of their choosing; Plaintiff finally was able to switch to a male locker room soon after that. It took until late July 2020 for the Port Authority to switch Plaintiff's first name and gender identity on its papers and electronic document, uniform and equipment rosters, and court notifications.

21. Meanwhile, in February 2019 Plaintiff began hormonal treatments, and on March 6, 2019 he officially announced to all of his coworkers that he was transitioned, his identity was male, and that he wanted to be treated as a man and referred to using male pronouns. Plaintiff legally changed his name to Michael on May 15, 2019.

22. Starting March 6, 2019, and on a repeated and continuing basis thereafter – on over fifty separate occasions – Sgt. Brenneck, several other superiors, and multiple coworkers purposely referred to Plaintiff using female pronouns and his pre-transition name.

23. Following the lead of their superiors, dozens of the Plaintiff's coworkers began insulting or ostracizing him, including by misgendering or mis-naming him over Port Authority radio communications for all of his coworkers to hear, and on multiple occasions by revealing Plaintiff's former gender identity to new employees who had not previously known him as a woman. This all humiliated Plaintiff.

24. Worse, on about May 15, 2019, after returning to work from an extended leave for gender confirmation surgery, Plaintiff discovered that his sealed inter-agency mail pouch (containing sensitive information about his medical processes and gender change, and a copy of his new driver's license) was missing from the Police Desk, a secure area manned by and only accessible by Plaintiff, his co-workers, and his superiors. In other words, one or more of Plaintiff's coworkers and/or superiors stole or hid his personal documents.

25. On about June 14, 2019, one of Plaintiff's direct superiors, then-Sergeant (now Lieutenant) Aaron Woody called Deputy Inspector Steven Yablonsky to express his concern that Plaintiff was very stressed, had lost weight, and was clearly having a difficult time at work, and that (he suspected) it was because Plaintiff was being continuously harassed.

26. Upon information and belief, D.I. Yablonsky took no action in response to Sgt. Woody's expression of concern, and the near-daily harassment of Plaintiff did not cease. So on about June 28, 2019, Plaintiff submitted a Handwritten Memorandum complaining that his coworkers were misgendering him and using the wrong pronouns to address him on a daily basis.

27. In response to Plaintiff's Handwritten Memorandum, on July 15, 2019 he was summoned to Port Authority Headquarters to meet with Assistant Chief of Police Michael Brown, D.I. Yablonsky, Lieutenant Thomas Michaels, and HR Representative Desire.

28. During the meeting, Plaintiff reiterated that he was experiencing sexual harassment

and discrimination. D.I. Yablonsky downplayed the severity of the harassment and defended an on-air radio misgendering (that Lt. Michaels had proactively brought to his attention) by P.O. Gregory Rose, saying that Rose misgendered Plaintiff because he was "distressed." HR Desire, for her part, said the harassment of Plaintiff "will work itself out." The meeting ended without any of the participants indicating that any action would be taken to prevent further harassment, or to discipline the participants in such harassment.

29. On about September 3, 2019, Plaintiff filed another written complaint with HR because another co-worker, Police Officer Fallon Mullen, twice humiliatingly misgendered him while they were in public, when civilians approached Plaintiff and asked to take pictures with him.

30. Upon information and belief, Plaintiff's supervisors and manager knew about these incidents of harassment, as they were open and obvious. Yet Port Authority management did nothing about it, so on about October 7, 2019 Plaintiff submitted yet another Handwritten Memorandum to Lt. Michaels (which was forwarded to D.I. Yablonsky and HR), in which Plaintiff complained about Sgt. Brenneck's mistreatment.

31. Once Plaintiff filed *that* complaint, Sgt. Brenneck's harassment worsened and he began actively retaliating against Plaintiff.

32. Among other things, Sgt. Brenneck repeatedly refused to sign Plaintiff's "memobook" (a police officer's personal daily log book, which records his daily activities, posts, and assignment completions) as required by Port Authority policy, repeatedly refused to acknowledge Plaintiff's salutes, and repeatedly refused to speak to Plaintiff or even acknowledge Plaintiff's presence. On two occasions in December 2019, Sgt. Brenneck even refused to reveal Plaintiff's assignment to him – meaning that Plaintiff was unaware of his assigned call sign or post, and thus effectively unprepared to do his work.

33. Unbeknownst to Plaintiff at the time, Sgt. Brenneck also reported to the Vice President of Plaintiff's union (notably, not Sgt. Brenneck's own union) that Plaintiff had "ratted to the job on him" – upon information and belief to further turn Plaintiff's coworkers against him.

34. Most significantly, Sgt. Brenneck also failed to call Plaintiff to emergency response drill training, leaving him less prepared to handle potential crisis situations. Sergeants are required to conduct such training for the officers under their command twice per month – but once Plaintiff complained about him in October 2019, Sgt. Brenneck never offered Plaintiff the training once through the summer of 2020, when Sgt. Brenneck voluntarily transferred to the PATH Command.

35. In about December 2019, a New York City police officer was shot while on duty in the Bronx. In response, the D.I. Yablonsky issued a command order that to increase safety, all Port Authority police officers were to patrol only in teams.

36. And yet, on about February 12, 2020, Plaintiff's assigned partner P.O. Rose refused to ride with Plaintiff. Upon information and belief, P.O. Rose's motives were discriminatory, as P.O. Rose had in the past purposely referred to Plaintiff using the wrong gender multiple times (purportedly because he was "stressed"). Sgt. Brenneck twice crossed paths with Plaintiff that day while he was on post or patrol alone – yet Sgt. Brenneck did nothing.

37. Plaintiff filed another written complaint on about April 29, 2020 because Port Authority radio dispatcher P.O. Sharon Otero referred to him as "she," and Lt. Scot Pomerantz and D.I. Yablonsky heard this occur but failed to correct it.

38. In continued harassment, on June 3, 2020 P.O. Nancy Farrell continued to refer to Plaintiff as "she" in front of co-workers that did not know him prior to his transition. Plaintiff filed a Port Authority EEO complaint about this on or about the next day, June 4, 2020, but as far as Plaintiff is aware, nothing was done in response.

39. On June 24, 2020, another coworker, police officer Katrina Holder, misgendered Plaintiff for the fourth time, in the presence of another coworker.

40. In all, Plaintiff complained to management that he was being shamed and harassed by his superior and coworkers at least seven times within the fifteen months between March 2019 and June 2020. His complaints had no obvious impact.

41. Plaintiff was on medical leave from work through most of the summer of 2020, while he underwent and recovered from gender-affirming surgery. He returned to work in about late August.

42. More recently, on about October 8, 2020 while Plaintiff was on a tour of duty, and using a restroom urinal, his coworker P.O. Justin Abramopaulos stared at Plaintiff's genitalia; he then later referred to Plaintiff multiple times (in Plaintiff's presence) as "it," "whatever it is," and a "transvestite," also telling coworkers that Plaintiff that had a "sex change" and had a "rubber dick." These episodes were humiliating.

43. Upon information and belief, no one at the Port Authority has ever taken any action to discipline or punish any of Plaintiff's co-workers or superiors for harassing him or retaliating against him.

44. The above are just some examples of some of the unlawful discrimination and retaliation to which the Port Authority has subjected Plaintiff.

45. The Port Authority's actions and omissions constituted a continuing violation of the law.

**FIRST CAUSE OF ACTION:**
**TITLE VII – HOSTILE WORK ENVIRONMENT**

46. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

47. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

48. This prohibition against discrimination in the "terms, conditions, or privileges of employment," is not limited to "economic" or "tangible" discrimination"; it also "makes it unlawful for an employer to require an employee to work in a discriminatorily hostile or abusive environment." *Sherman v. Fivesky, LLC*, No. 19 Civ. 8015 (LJL), 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

49. To establish a hostile work environment, a plaintiff must that a defendant's conduct: (1) was objectively severe ***or*** pervasive, in that it created an environment that a reasonable person would find hostile ***or*** abusive; (2) created an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

50. In this case, Plaintiff's coworkers and supervisors purposely subjected him to discriminatory and harassing conduct that was both severe and pervasive: being misgendered, called by the wrong pronouns, "outed" as transgender, or shunned on scores of occasions, often in front of other coworkers or over the radio for them to hear, or in public; being denied the restroom and locker room of his choice for months; and being leered at and then ridiculed based on his anatomy.

51. The Port Authority engaged in or knowingly tolerated these unlawful discriminatory acts and employment practices, receiving multiple complaints about them from Plaintiff and others, yet doing little or nothing to halt the offending behavior.

52. As a result of the severe and pervasive harassment to which he was subjected, and Port Authority's repeated failure to rectify it, Plaintiff has also suffered considerable emotional distress and mental anguish.

53. Plaintiff is accordingly entitled to compensatory damages in amounts to be determined at trial.

**SECOND CAUSE OF ACTION**
**TITLE VII – RETALIATION**

54. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as if fully stated herein.

55. Title VII also provides that it shall be an unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

56. The Port Authority engaged in unlawful employment practices prohibited by this provision by retaliating or permitting retaliation against Plaintiff with respect to the terms, conditions, or privileges of his employment because he opposed his superiors' and coworkers' unlawful employment practices.

57. The retaliatory adverse actions to which Plaintiff was subjected included but are not limited to being widely shunned, not being informed of his assignments or posts, not being assigned to vital emergency training, and being forced to patrol alone when his assigned partner shunned him.

58. Upon information and belief, the Port Authority engaged in, sanctioned, or knowingly failed to halt these unlawful retaliatory practices.

59. The Port Authority thus engaged in or knowingly tolerated unlawful employment practices prohibited by Title VII, as a result of which Plaintiff has also suffered considerable emotional and physical distress and mental anguish.

60. Plaintiff is accordingly entitled to compensatory damages in amounts to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements; and for such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

Date: July 18, 2021
New York, New York

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

BY: *_/s/ Daniel S. Kirschbaum_*
Daniel S. Kirschbaum, Esq.
One Pennsylvania Plaza, Suite 4905
New York, New York 10119
(212) 587-0760

*Attorneys for Plaintiff*